# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CDX HOLDINGS, INC. (f/k/a CARIS LIFE SCIENCES, INC.), | § § § § § | No. 526, 2015 |
| Defendant-Below, Appellant/Cross-Appellee, | § § § | Court Below – Court of Chancery of the State of Delaware C.A. No. 8031 |
| v. | § § | |
| KURT FOX, | § § § | |
| Plaintiff-Below, Appellee/Cross-Appellant. | § § § | |

Submitted: April 20, 2016
Decided: June 6, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, and **VAUGHN**, Justices, and **MEDINILLA**,[1] Judge, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Thomas A. Beck, Esquire, (*Argued*), Gregory P. Williams, Esquire, Brock E. Czeschin, Esquire, Susan M. Hannigan, Esquire, Rachel E. Horn, Esquire, Matthew D. Perri, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Michael C. Holmes, Esquire, Daniel L. Tobey, Esquire, Craig E. Zieminski, Esquire, Olivia D. Howe, Esquire, George M. Padis, Esquire, Vinson & Elkins, LLP, Dallas, Texas, Attorneys for Defendant-Below, Appellant/Cross-Appellee.

Christopher P. Simon, Esquire, David G. Holmes, Esquire, Cross & Simon, LLC, Wilmington, Delaware; Daniel S. Cahill, Esquire (*Argued*), Louis Gambino, Esquire, Cahill Gambino LLP, Saratoga Springs, New York, Attorneys for Plaintiff-Below, Appellee/Cross-Appellant and the Class.

**HOLLAND**, Justice, for the Majority:

---

[1] Sitting by designation pursuant to art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4(a) to complete the quorum.

Caris Life Sciences, Inc. ("Caris") was a privately held Delaware corporation. Through subsidiaries, it operated three business units: Caris Diagnostics, TargetNow, and Carisome. Caris Diagnostics was consistently profitable. TargetNow generated revenue but not profits. Carisome was in the developmental stage.

To achieve the dual goals of securing financing for TargetNow and Carisome and generating a return for its stockholders, Caris sold Caris Diagnostics to Miraca Holdings, Inc. ("Miraca"). To minimize taxes, the transaction was structured using a spin/merge structure (the "Miraca Transaction"). Caris first transferred ownership of TargetNow and Carisome to a new subsidiary, then spun off that subsidiary to its stockholders (the "Spinoff"). At that point, owning only Caris Diagnostics, Caris merged with a wholly owned subsidiary of Miraca (the "Merger").

David Halbert ("Halbert"), the founder of Caris, owned 70.4% of its fully diluted equity. JH Whitney VI, L.P. ("Fund VI"), a private equity fund, owned another 26.7%. Halbert and Fund VI received a proportionate equity stake in the spun-off entity ("SpinCo"), which kept them whole for purposes of their pre-transaction beneficial ownership of TargetNow and Carisome. In the Merger, Miraca paid $725 million for what was left of Caris ("RemainCo."). Each share of RemainCo. stock was converted into the right to receive $4.46 in cash. Halbert

2

and Fund VI received their share of the cash, representing the value of their pre-transaction beneficial interest Caris Diagnostics. Through the Miraca Transaction, Halbert and Fund VI received total proceeds of approximately $560 million. They financed SpinCo by reinvesting $100 million.

Most of the remaining approximately 2.9% of Caris's fully diluted entity took the form of stock options that were cancelled in connection with the Merger. Under the terms of the 2007 Stock Incentive Plan (the "Plan"), each holder was entitled to receive for each share covered by an option the amount by which the Fair Market Value ("FMV") of the share exceeded the exercise price. The Plan defined FMV as an amount determined by the Caris board of directors (the "Board"). The Plan required the Board, as the Plan Administrator, to adjust the options to account for the Spinoff. Under the terms of the Plan, the Board's good faith determinations, as the Administrator, were conclusive unless arbitrary and capricious.

Caris told the option holders that they would receive the difference between $5.07 per share and the exercise price of their options, minus 8% that would go to an escrow account contemplated by the merger agreement. Of the $5.07, $4.46 was for RemainCo.; the remaining $0.61 was for SpinCo.

3

### Plaintiff's Contentions

The plaintiff-below, Kurt Fox ("Fox"), sued on behalf of a class of option holders. According to Fox, Caris breached the Plan because members of management, rather than the Board, as the Plan Administrator, determined how much the option holders would receive. He also contended that regardless of who made the determination, the $0.61 per share attributed to SpinCo was not a good faith determination and resulted from an arbitrary and capricious process. Finally, he contended that the Plan did not permit Caris to withhold a portion of the option consideration as part of the escrow holdback contemplated by the merger agreement.

Trial took place from December 3–5, 2014. Fox had the burden of proving his contentions by a preponderance of the evidence. The parties introduced 217 exhibits, depositions for nine witnesses, and presented live testimony from five fact witnesses and one expert. After trial, Caris was permitted to supplement the record with two additional exhibits.

### Court of Chancery Decision

The Plan required and directed the Administrator (the entire Board) to use good faith to determine and properly adjust the options to account for the FMV of SpinCo. These were contractual obligations, not fiduciary responsibilities, under the Plan. The Court of Chancery determined, as a matter of fact, that the Board, as

4

the Plan Administrator, never made any determination of the value the option holders would receive under the Plan, and failed to adjust the options for the spinoff. The Court of Chancery concluded that certain directors were not even aware of their duties as the Plan's Administrator or the Plan itself and merely deferred to Halbert — Caris' Chairman, CEO and 70.4% stockholder. The Court of Chancery found that Caris' CFO/COO Gerard Martino ("Martino") made the options-value determination to obtain a tax-free spinoff rather than to determine FMV for the Plan and that determination received perfunctory sign-off by Halbert.

The Court of Chancery found that regardless of who made the value determination, FMV was not determined, and the value received by the option holders was not determined in good faith. In addition, the Court of Chancery found the evidence used to support the decided value was determined by Martino through a process that was "arbitrary and capricious." The Court of Chancery began its 82 page opinion with the following summary:

> The evidence at trial established that the Board did not make the [Fair Market Value] determination it was supposed to make. Gerard A. Martino, the Executive Vice President, Chief Financial Officer, and Chief Operating Officer, made the determinations, then received perfunctory signoff from Halbert. The evidence at trial further established that the number Martino picked for SpinCo was not a good faith determination of Fair Market Value. It was the figure generated by PricewaterhouseCoopers ("PwC"), the Company's tax advisor, using an intercompany tax transfer analysis that was designed to ensure that the Spinoff would result in

5

zero corporate level tax. Martino told PwC where to come out, and he supplied PwC with reduced projections to support the valuation he wanted. PwC's conclusion that SpinCo had a value of $65 million conflicted with Martino's subjective belief from earlier in the year that TargetNow alone was worth between $150 and $300 million. It likewise conflicted with the views held by Halbert, Fund VI, and the Company's financial advisor. It contrasted with higher values that a different accounting firm, Grant Thornton LLP, generated for the same businesses in a series of valuation reports prepared during 2011.

Miraca questioned PwC's valuation and insisted on a second opinion from Grant Thornton. Martino and PwC met with Grant Thornton before the firm started work. Two days later, Martino sent an email to Halbert that precisely anticipated the range of consideration per share that the two reports would support. Grant Thornton then proceeded to prepare a valuation that largely – and admittedly! – copied PwC's analysis. Grant Thornton's answer came in just below PwC's. The valuation was not determined in good faith, and the process was arbitrary and capricious.

Finally, the plain language of the Plan did not permit Caris to withhold a portion of the option consideration in escrow. The merger agreement was not the contract that governed the relationship between the option holders and Caris. The Plan was.

Caris breached the Plan. The class is entitled to damages of $16,260,332.77, plus pre- and post- judgment interest at the legal rate, compounded quarterly, from November 22, 2011 until the date of payment.

### Appellant's Contentions

The appellant argues that the Court of Chancery committed legal error by focusing on an officers' (specifically Martino's) conduct, instead of the Board's

6

conduct; finding a breach of the Plan contract's subjective good faith standard; and measuring damages by what it decided an objectively reasonable Board would have done. The appellant also contends that the Court of Chancery erred by imposing a heightened standard of review on the Plan's contractual good faith determinations; applying an arbitrary and capricious test on top of the good faith standard; and by defining the Plan contract's arbitrary and capricious standard based on the federal Administrative Procedures Act. Finally, the appellant submits that the Court of Chancery erred in valuing SpinCo based on outdated data; concluding that the underlying motivation in valuing SpinCo was to achieve zero taxes by using projections that were "falsely low"; and by calculating damages without making a determination as to the goodwill associated with SpinCo.

### *Standard of Review*

After a trial, findings of historical fact are subject to the deferential 'clearly erroneous' standard of review. That deferential standard applies not only to historical facts that are based upon credibility determinations but also to findings of historical fact that are based on physical or documentary evidence or inferences from other facts. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.[2] When factual findings are based on determinations regarding the credibility of witnesses, the

---

[2] *Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 236 (Del. 2011).

7

deference already required by the clearly erroneous standard of appellate review is enhanced.[3]

## *Judgment Affirmed*

As the Administrator of the Plan, the Board was required to perform certain obligations. The Court of Chancery found that "the Board did not make the [FMV] determinations it was supposed to make" under the Plan. Instead, the Court of Chancery found that Martino separately determined the option holders' value. The court rejected the defense theory, which attempted to equate a Board resolution approving the Miraca Transaction with Plan performance by the Board in its role as Administrator. The Court of Chancery found that the Board did not perform the Plan Administrator's contractual obligations solely by noting in resolutions that such obligations exist:

> The minutes of the October 5, 2011 meeting reflect that the Board recognized the need to adjust the exercise price of the stock options to reflect the value of the Spinoff. *But the Board never set the adjusted price.* The resolutions adopted at the meeting state:
>
> **RESOLVED,** that, subject to the consummation of the Distribution [*i.e.,* the Spinoff], the exercise price of each Option shall be proportionately adjusted to take into account the Distribution;, [sic] provided, however, that any fractional shares resulting from the adjustment shall be eliminated[.]
>
>          \*     \*     \*

---

[3] *Cede & Co. v. Technicolor, Inc.,* 758 A.2d 485, 491 (Del. 2000) (citing *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 575 (1985)).

The Board just as easily could have passed a resolution saying "the Company shall be in compliance with all of its contractual commitments." Passing such a resolution would not make it so.[4]

The Court of Chancery also found that the Board subjectively believed TargetNow and Carisome had a FMV of "around $300 million" based upon extensive contemporaneous evidence. Although several defense witnesses tried to disavow such evidence, the Court of Chancery assessed their credibility, reviewed the contemporaneous evidence and decided not to credit their unsubstantiated trial testimony.

The Plan called upon the Board to determine FMV in good faith and to adjust the options to reflect the Spinoff. Because the Board did not act, the Court of Chancery stated the "good faith standard arguably does not even apply." Assuming it did apply, it was not clear to the Court of Chancery to whom it should be applied. The Court of Chancery concluded that Martino actually made the value determination, and Halbert signed off. Accordingly, the Court of Chancery's decision analyzed whether Martino and Halbert acted in subjective good faith:

> The operative question is whether the $65 million value they placed on SpinCo reflected their subjective belief about the value of TargetNow and Carisome. It did not.
>
> * * *
>
> Assuming for purposes of analysis that Martino and Halbert did believe subjectively in the valuation they

---

[4] *Fox v. CDX Holdings, Inc.*, 2015 WL 4571398, at *17, *24 (Del. Ch. July 28, 2015) (emphasis in original).

9

selected, the process they followed was nonetheless arbitrary and capricious.

This Court must give deference to findings of fact by trial courts when supported by the record, and when they are the product of an orderly and logical deductive reasoning process, especially when those findings are based in part on testimony of live witnesses whose demeanor and credibility the trial judge has had the opportunity to evaluate.[5] The record in this appeal compels an application of that standard of appellate review. Accordingly, the judgment of the Court of Chancery is affirmed on the basis of and for the reasons stated in its July 28, 2015 decision.[6]

## Cross-Appeal

Fox contends that a typographical error or mistake inadvertently altered the damages calculation. We will not address that claim of error in the first instance on appeal. Fox may raise that matter with the Court of Chancery after the mandate is issued in this appeal.

## Conclusion

The judgment of the Court of Chancery is affirmed.

---

[5] *Nixon v. Blackwell*, 626 A.2d 1366, 1378 n.16 (Del. 1993).
[6] *Fox v. CDX Holdings, Inc.*, 2015 WL 4571398 (Del. Ch. July 28, 2015).

**VALIHURA**, Justice, dissenting:

The Board of Caris, as the "Administrator" of the Company's 2007 Stock Incentive Plan (the "Plan"), was required to make two determinations. The first was to determine the fair market value ("FMV") of the common stock of the Company. The second determination was to make certain capitalization adjustments in connection with a spin-off of two of the Company's business units. The Court of Chancery, in my view, erred in finding that the Board breached these contractual obligations. Accordingly, I respectfully dissent.

## I. STANDARD OF REVIEW

Determining whether a party has breached a contractual duty of good faith requires a court to reach a legal conclusion. This Court reviews a trial court's legal conclusions *de novo*.[7] This Court will uphold the Court of Chancery's factual findings so long as they are not clearly erroneous.[8] The clearly erroneous standard applies to factual determinations based on credibility and the evidence.[9] This Court also has the authority to review the entire record and reject the trial court's findings if they are not supported by the record or are not the product of a logical

---

[7] *Hill Int'l, Inc. v. Opportunity Partners L.P.*, 119 A.3d 30, 37 (Del. 2015) (citing *N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 380-81 (Del. 2014)).

[8] *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1212 (Del. 2012) (citation omitted).

[9] *Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 236 (Del. 2011).

11

and orderly deductive process.[10] Here, certain of the Court of Chancery's findings, in my view, fail to satisfy that test.

The plaintiff, Fox, was required to prove that the Board breached its contractual duty of subjective good faith either by demonstrating that the Board acted in subjective bad faith or by showing that it consciously disregarded a known duty to act.[11] With respect to subjective bad faith, Fox was required to prove that a majority of the Board did not subjectively believe in the FMV it determined. If Fox proceeded under a conscious disregard theory, he would have been required to prove that a majority of the Board intentionally failed to form a subjective belief as to FMV in the face of a known duty to act. I do not believe the record supports either conclusion.

As to the first test, the Court of Chancery made no factual findings supporting the conclusion that a majority of the Board acted in bad faith. That is because the trial court concluded that the Board did not act—a conclusion with which I disagree. Because the court never made the Board-related bad faith findings required by the Plan, this Court is left only with incomplete factual

---

[10] *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972).

[11] *ev3, Inc. v. Lesh*, 114 A.3d 527, 539 (Del. 2014) (citing *DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chicago, Ill.*, 75 A.3d 101, 110 (Del. 2013)) ("[A] plaintiff contending that a party did not comply with its express contractual duty of good faith would typically have to show that the party acted in *subjective* bad faith." (emphasis in original)); *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 105-06 (Del. 2013) ("To plead a breach of the subjective good faith standard under a conscious disregard theory, [the plaintiff must demonstrate that the defendant] consciously disregarded its contractual duty to form a subjective belief. It would take an extraordinary set of facts to do that.").

12

findings to which we cannot properly defer.[12] The trial court then erroneously applied a good faith test solely to the actions and beliefs of Martino and Halbert, analyzing whether they acted in good faith.[13] If the trial court believed that the Board had not acted, then it should have proceeded to analyze whether a majority of the Board *intentionally* failed to act in the face of a known duty to act. This typically requires an extraordinary set of facts. Such facts, as to the Board's conduct, are not present here.

The trial court's conclusions, in my view, are not entitled to deference for another reason. The Court of Chancery *implicitly* rejects the trial testimony of the directors in passages that refer to unidentified "defense witnesses" based upon a "hindsight bias" theory it derived from certain psychological literature. The court concludes in this regard:

> At trial, the defense witnesses testified differently. Except for Martino and Halbert, the defense witnesses seemed honestly to believe when testifying that they thought TargetNow and Carisome

---

[12] The trial court expressly held that "the Board did not act," and observed that "the good faith standard arguably does not even apply." *Fox v. CDx Holdings, Inc.*, 2015 WL 4571398, at *26 (Del. Ch. July 28, 2015). It then assumed that it did apply to Martino and Halbert, stating: "Martino actually made the determination, and Halbert signed off, so this decision analyzes whether they acted in subjective good faith." *Id.* Thus, the Court of Chancery's statements—contained in the "Damages" section of its Opinion—about "what the Board would have determined to be the Fair Market Value of a share of Caris common stock in connection with the [m]erger, if it had adjusted the options to take into account the Spinoff and made its determination in good faith," are not findings that the Board acted in subjective bad faith in determining FMV. *Id.* at *36. Rather, the court's decision is clear that it found that the Board had failed to act to determine FMV.

[13] The trial court's discussion of *scienter* scrutinizes the conduct of Martino and Halbert, as opposed to the subjective beliefs and actions of each of the members of the Board.

had very little value in fall 2011.[14] In my view, this was a product of hindsight bias. "Hindsight bias has been defined in the psychological literature as the tendency for people with outcome knowledge to believe falsely that they would have predicted the reported outcome of an event."[15]

In my view, this Court should be skeptical of court rulings predicated upon social science studies, particularly where, as here, such theories impact a trial court's own post-trial impressions of the testimony offered.[16] Such skepticism seems appropriate in this case, since immediately after trial the Court of Chancery stated that "the credibility of the people on the [B]oard who made these decisions" was "very, very strong."[17] For example, the trial court had the following "reactions"[18] after the three-day trial:

> So for the defendants, I think what's very, very strong is the contractual standard, assuming the good faith standard is, indeed, the operative standard, and the credibility of the people on the Board who made these decisions.[19]

*     *     *

---

[14] At trial, the plaintiff called Martino, Halbert, and an expert, Robert F. Reilly, as witnesses. The defense called directors Laurie Johansen ("Johansen"), Jonathan Knowles ("Knowles"), and Peter M. Castleman ("Castleman"). Thus, the trial court appears to be referring to the honest beliefs of three of the four members of the Board who testified at trial.

[15] *Id.* at *3 (quoting Hal R. Arkes & Cindy A. Schipani, *Medical Malpractice v. the Business Judgment Rule: Differences in Hindsight Bias*, 73 OR. L. REV. 587, 591 (1994)).

[16] *See, e.g., Free v. Peters*, 12 F.3d 700, 706 (7th Cir. 1993) (Posner, C.J.) (observing that review of conclusions based on "social scientific or other data . . . is plenary"), *cert. denied*, 513 U.S. 967 (1994); *Dunagin v. City of Oxford, Miss.*, 718 F.2d 738, 748 n.8 (5th Cir. 1983) (subjecting "the 'fact' findings of a trial judge as to the latest truths in the social sciences" to the "clearly erroneous standard of review" is "[c]learly not" appropriate), *cert. denied*, 467 U.S. 1259 (1984).

[17] A794.

[18] A793 ("[T]hese are my reactions from having been here with you all for the last three days.").

[19] A794.

And PwC, you know, I think there's problems with PwC's work. I think there's serious problems with Grant Thornton's work. So since I think the defendant's position on the good faith issue and the good faith of the people involved is, I think, as I said, quite strong, I'm going to dilate a little bit more on the PwC and Grant Thornton things.[20]

\* \* \*

This is one of these troubling things where the people at the top seem to have tried to proceed in the correct manner.[21]

\* \* \*

I don't think it would be helpful -- as I said, you can present your case [in post-trial briefing] however you want. I don't think it would be helpful to make the argument that these folks intentionally tried to harm their option holders. Having seen the people here, it's very hard for me to think that's what they did. Maybe if you put it all together and line everything up, that will be what you try to convince me of. I have a lot of trouble thinking that's actually what went on.[22]

Admittedly, there are some comments that tilt the other way, but they are primarily focused on the *advisors'* analyses, and none seem genuinely to discredit the directors' testimony or the trial court's impressions that the Board had acted in good faith. I recognize that the trial court's post-trial comments may have been designed to direct the parties to focus on certain issues for purposes of post-trial briefing and perhaps to encourage the parties to settle. That kind of guidance is helpful to the litigation process. But even so, I credit the Court of Chancery's comments as being an accurate and sincere account of its impressions of the trial

---

[20] A794-95.
[21] A805.
[22] A807.

15

testimony. The subsequent implicit discrediting of the directors' testimony in the Opinion, based apparently and solely on its hindsight bias theory, strains, to the point of breaking, my strong desire and inclination to exercise judicial restraint in the area of deference to trial court fact-finding. As such, the court's post-trial statements contribute to my conclusion that the Court of Chancery's ultimate findings are logically disconnected from the record evidence before it, from the trial court's own immediate, on-the-record impressions of the trial, and from the requirements of the legal test established by the Plan.

Employing its hindsight bias theory, the trial court found that unspecified "defense witnesses" did not subjectively believe in a low valuation in late 2011. In support of this conclusion, the court relied upon "contemporaneous" evidence that appears to consist of indications of interest from potential bidders for TargetNow, Grant Thornton's pre-transaction valuations,[23] and evidence "from the files of JH

---

[23] The Grant Thornton reports reflecting valuations in excess of those utilized in the transaction had valuation dates ranging from March 2010 through March 2011. *See* B2; B73; B143; B213; B291. In discussing the value the Board attributed to TargetNow, the court cited to an internal PwC email stating that Martino, a non-Board member, "thinks [TargetNow is] worth 150 to 300 M." B209. Further, the Court of Chancery relied on Citigroup Global Markets ("Citi") estimates suggesting that the TargetNow business unit was worth between $195 million and $300 million, in addition to internal documents of J.H. Whitney referencing figures greater than $150 million. *See* B480; B484. In addition, the contemporaneous evidence generated by Grant Thornton and Citi pre-dated the events that occurred in the summer of 2011. The collective statements of the directors who testified at trial indicated that the value of SpinCo declined in late 2011 as a result of, among other things, the failed assay, cancelled product trials, and the rejection of the products by doctors and insurance companies, each of which contributed to accelerating losses, downgraded forecasts, and declining revenues. *See, e.g.*, A700-01 (Castleman testimony stating: "By the late summer, the lab, this AP business, generated about 40 million of cash and yet we were down 20 million of cash. So those two businesses alone, for a very short period of time,

16

Whitney."[24] The trial court also referenced certain emails sent in the lead-up to the close of the Miraca transaction. The communications reflect Halbert and Johansen's optimism with respect to the *potential* value of SpinCo, but do not amount to *Board* approval of valuations hundreds of millions of dollars in excess of PricewaterhouseCoopers' ("PwC") $65 million valuation.[25] The trial court focused on the subjective beliefs of Martino, the Company's CFO and COO, who was not a member of the Board. While it is true that live determinations of credibility are entitled to deference from this Court, the trial court's live

---

had eaten 60 million of cash. So we were going toward a cash crunch and a situation that was not -- we were going to run out of money. So we had a bad situation in that regard.").

[24] *Fox*, 2015 WL 4571398, at *27. There are no findings that any of the Company's directors, other than Halbert, knew of any flaws in PwC's or Grant Thronton's analyses. Nor is there any evidence in the record before this Court that the Board, including Castleman, reviewed documents from J.H. Whitney or that the Board ever saw the Grant Thornton report used in the transaction. *See* A709-10. In fact, Castleman was asked at trial about the November 3, 2011 J.H. Whitney VI, L.P. Annual Meeting presentation discussed by the trial court and testified that he did not attend that meeting, had no role in the creation of the documents that went to investors in Fund VI, and had not seen the annual meeting document prior to the litigation in this matter. Castleman testified that he "did not think TargetNow could be sold" and that Carisome was "ten years or 20 years" from commercialization. The trial court rejected this testimony by simply stating, "I credit the contemporaneous documents." *Fox*, 2015 WL 4571398, at *27 n.15. Johansen also testified that she was not aware of a price range that was conveyed to J.H. Whitney for the sale of TargetNow. B734. There are no findings as to Dr. George Poste and Stephen Green, two outside directors who never testified.

[25] *See Fox*, 2015 WL 4571398, at *27 (noting that "Halbert and other members of management spoke glowingly and optimistically about Carisome's prospects"). Johansen explained her reference to SpinCo as a "juggernaut" by testifying, "I was referring to the fact that if the technology were successful there was big opportunity." A762. She emphasized that "the big 'if,' of course, was we had to prove the technology." *Id.* Johansen also stated that the recipients of the email characterizing SpinCo as a juggernaut "all understood kind of the implied 'if,' and I didn't go into explaining the email." A763. The Court of Chancery's findings also reflect the indeterminate future value of SpinCo. For example, the court concluded that, "although riskier," the Board thought Carisome was "likely worth more" than TargetNow, "but only if the lottery ticket paid off." *Fox*, 2015 WL 4571398, at *36. The trial court concluded: "Placing an actual value on Carisome was extremely difficult because if it succeeded, the company would be worth billions, but if it failed, it would be worth nothing." *Id.* at *26.

17

determinations in this case *support* a finding that the directors' testimony is credible. And it appears the Court of Chancery's hindsight bias theory overrode those conclusions.

Because the Court of Chancery held that the Board did not act to determine FMV, it did not find that a majority of the directors acted in bad faith in making that determination. Nor did it find that the Board consciously disregarded a known duty to act. Further, knowledge of bad faith cannot be imputed from an executive or even from a director to the entire Board on the basis of this record.[26] Accordingly, I would reverse the judgment of the Court of Chancery on this basis.

## II. THE BOARD'S ACTIONS AND SUBJECTIVE BELIEFS

### A.  *The Terms of the Plan and Merger Agreement*

A brief review of certain features of the transaction and related documents are important in explaining my conclusion that the Board acted in satisfaction of the Plan's requirements. In 2011, Caris transferred ownership of Carisome and TargetNow to a new subsidiary. That subsidiary was then spun off to the Company's stockholders. Thereafter, Caris owned only a third business unit, Caris Diagnostics (the "AP Business"), and merged with a wholly owned subsidiary of Miraca. In the merger, Miraca paid $725 million for what remained of Caris after

---

[26] *Cf. Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007) ("I also reject [the plaintiff's] contention that knowledge on the part of any one board member can be imputed to other board members as a result of their shared board or committee service. . . . Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes." (citations omitted)).

18

TargetNow and Carisome were spun off. Each share of RemainCo stock was converted into the right to receive $4.46 in cash. Option holders were to receive the difference between $5.07 per share and the exercise price of their options, *minus* 8% that would be placed into an escrow account contemplated by the Agreement and Plan of Merger with Miraca (the "Merger Agreement"). Of the $5.07, $0.61 was attributed to the spun-off entity. Caris' $5.07 option price was driven by the $725 million merger price and PwC's $65 million valuation of SpinCo.

The Plan provides that each option holder is entitled to receive for each share covered by an option the amount by which the FMV of the share exceeds the exercise price. As defined by Section 2.25 of the Plan, FMV is "the value of the Common Stock as determined in good faith by the Administrator . . . ."[27] The Plan does not define "good faith." Further, Section 3.3 of the Plan affords the Administrator the broad discretion "to make any and all other determinations which it determines to be necessary or advisable for administration of the Plan."[28]

---

[27] A814.

[28] A817. Section 3.3 of the Plan affords the Board broad administrative authority. In relevant part, Section 3.3 provides:

> 3.3    Specific Powers. In particular, the Administrator shall have the authority: . . . (iii) to authorize any person to execute, on behalf of the Company, any instrument required to carry out the purposes of the Plan; . . . (ix) to amend any outstanding Awards, including for the purpose of modifying the time or manner of vesting, the purchase price or exercise price, or the term of any outstanding Award; . . . and (xii) to exercise discretion to make any and all other

19

Under Section 3.4 of the Plan, "[a]ll decisions made by the Administrator" pursuant to the provisions of the Plan are "final and binding on the Company and [participants in the Plan], unless such decisions are determined to be arbitrary and capricious."

Section 12.3 of the Plan states that the Company, "to the extent permitted by applicable law, but otherwise in the sole discretion of the Administrator," may provide for the cancellation of outstanding options in exchange for "the difference between the Fair Market Value and the exercise price for all shares of Common Stock subject to exercise (*i.e.*, to the extent vested) under any outstanding Option[.]"[29] Section 12.1 of the Plan requires that the Board, as Administrator, make capitalization adjustments in connection with the spin-off of the TargetNow and Carisome business units. Specifically, the Plan mandates that the Board account for the spin-off by adjusting the exercise price of the options "to reflect any increase or decrease in the number of issued shares of Common Stock or change in the Fair Market Value of such Common Stock resulting from such transaction . . . ."[30]

---

determinations which it determines to be necessary or advisable for administration of the Plan.

*Id.*
[29] A835-36.
[30] A835.

The Merger Agreement contemplates the Board actions required by the Plan, as well. Section 2.11(a) provides: "Effective as of *immediately prior* to the Closing, the Company shall take all necessary actions pursuant to the [] Plan (and the underlying option grant agreements) . . . ."[31] Further, Section 2.11(b) provides that "[t]he [] Plan shall terminate *as of the Effective Time*, and no holder of Company Options issued pursuant to the [] Plan or any participant in the [] Plan shall have any rights thereunder . . . ."[32] The "Effective Time," as defined by the Merger Agreement, is the time that the Certificate of Merger is accepted for filing by the Secretary of State or a later date specified in the Certificate of Merger and agreed upon by the parties to the transaction. In this case, it was November 22, 2011.

### B. *The Board Determined Fair Market Value*

The following facts suggest to me that the Board did determine the FMV of the stock. I observe preliminarily that at trial, Johansen, who served as President of Caris Diagnostics and Vice Chairman of the Board, testified that, "under the terms of the [] [P]lan, the [B]oard is required to use good faith in determining fair market value."[33] She stated that the Board visited with legal counsel "to understand how [it] discharged [its] duty of good faith in determining fair market

---

[31] A1224 (emphasis added).
[32] A1225 (emphasis added).
[33] A766.

21

value."[34] The Company's legal counsel recommended that the Board "hire an independent advisor" to assist the directors in determining FMV.[35] "And that's what [the Board] did[] to determine fair market value," according to Johansen.[36]

### 1. The October 5 Board Meeting

On October 5, 2011, the Board held a telephonic meeting. All members of the Board were present. Also present at the meeting were Citi, PwC, legal counsel, and other Company executives. The meeting was convened to consider the Merger Agreement and a spin-off of the TargetNow and Carisome business units. During the meeting, Citi made a presentation to the Board concerning the equity waterfall mechanics that would be used to effect the adjustment of the options mandated by the Plan as a result of the spin-off.[37]

According to the October 5 minutes, PwC presented the valuation of the TargetNow and Carisome business assets to the Board. "[PwC] discussed the TargetNow, Carisome and intangibles valuations."[38] Prior to the meeting, the

---

[34] Id.
[35] A767.
[36] Id.
[37] A789.
[38] A1191. With respect to the October 5, 2011 PwC presentation to the Board, the minutes also state:

> The Board engaged in discussion with [PwC] to understand the assumptions and the methodology valuation. As required by the Merger Agreement with Miraca Holdings, Inc., the Board acknowledged the requirement of obtaining a second independent valuation of the TargetNow, Carisome and related business assets and instructed management to engage another reputable firm. [PwC] and Mr. Martino discussed that a second valuation would be sought from Grant Thornton.

Company's chief legal officer distributed what he identified to the Board as PwC's "valuation of SpinCo."[39] PwC also provided the Board with a draft valuation memorandum, the subject of which was: "Valuation analysis of certain trademarks, assets, and businesses of Caris Life Sciences."[40] The memorandum provides that the Company "engaged PwC to perform a valuation analysis of; [sic] 1. Caris US' TargetNow business ('TN Business'); 2. Caris US' Carisome business ('Carisome Business'); 3. The 'Caris Life Sciences,' 'Caris,' 'CarisPath,' 'CarisDiagnostics,' and 'Pathology Partners' trademarks ('Trademarks'); and 4. Other intangible assets ('Other Assets') used in the operation of the anatomic pathology business ('AP Business'), TN Business, and Carisome Business."[41] With respect to PwC's valuation of TargetNow, the memorandum provided: "Based upon this analysis, PwC determined a final carrying value of USD 47.23

---

Id. There are no findings suggesting that the PwC presentation did not occur or that the minutes are an inaccurate account of the Board's discussion. Compare Fox, 2015 WL 4571398, at *15-17 ("On October 5, 2011 the Board met telephonically with Citi, PwC, its legal counsel, and Caris executives to consider and approve an Agreement and Plan of Merger with Miraca. . . . The minutes of the October 5, 2011 meeting reflect that the Board recognized the need to adjust the exercise price of the stock options to reflect the value of the Spinoff."), with RBC Capital Mkts., LLC v. Jervis, 129 A.3d 816, 835 (Del. 2015) ("The trial court found, however, that the description of the process in the minutes was false . . . ." (internal quotation marks omitted)), and In re Rural Metro Corp. S'holders Litig., 88 A.3d 54, 72 (Del. Ch. 2014) ("The minutes . . . have the feel of a document drafted in anticipation of litigation, and the rose-colored description of the sale process that appears in the minutes does not match up with what actually took place.").

[39] A1148.
[40] A1161.
[41] A1162.

23

million for the *whole* of the TN Business."[42] As to PwC's valuation of Carisome, the memorandum set forth: "Based on this analysis, PwC determined a final value for the Carisome Business of USD 17.79 million."[43] At the October 5 meeting, the uncontroverted record is that PwC reviewed its valuations with the Board, and the Board authorized a final transaction based upon those valuations.[44]

On the basis of the $65 million valuation provided by PwC and the additional information provided by Citi, the Board held an executive session at the October 5, 2011 meeting during which it "voted and unanimously approved and adopted" resolutions that authorized the Merger Agreement and the Separation and Distribution Agreement (the "Separation Agreement"). The October 5 resolutions also provided the following recital:

> **WHEREAS**, pursuant to Section 12.1 of the Corporation's 2007 Stock Incentive Plan (the "Corporation Stock Plan") and the underlying option grant agreements, *subject to the consummation of the Distribution and prior to the consummation of the Merger*, the Corporation shall proportionately adjust each outstanding option to purchase shares of the Corporation's common stock (the "Options") to take into account the Distribution, provided, however, that any fractional shares resulting from the adjustment shall be eliminated[.][45]

---

[42] A1163 (emphasis added).

[43] *Id.*

[44] A1191; A1399; A764-72. *Cf. Fox*, 2015 WL 4571398, at *32 ("At trial, the defense witnesses wisely tried to distance themselves from Grant Thornton's work by conceding that it was flawed and arguing that no one relied on it.").

[45] A1193 (emphasis added). The October 5, 2011 resolutions also set forth the following recitals:

The Board resolved "that, subject to the consummation of the Distribution, the exercise price of each Option shall be proportionately adjusted to take into account the Distribution . . . ."[46]

On November 22, the Board authorized the cancellation of the options with the understanding that the PwC fair market valuation would be used. Johansen's testimony supports this conclusion. She testified as follows:

> A. This is [*sic*] unanimous consent of our [B]oard signed at the time of closing of the transaction.
>
> Q. And what did the written consent accomplish?
>
> A. This approved the distributions contemplated by the [S]eparation [A]greement where we issued the new stock to the existing stockholders as well as the adjustments to that option, the option plan.
>
> Q. How did the [B]oard value TargetNow and Carisome in connection with the spin-off and the cash-out of the options?
>
> A. So under the terms of the incentive plan, the [B]oard is required to use good faith in determining fair market value. And at that time, there was a lot going on, but we were working with Shearman & Sterling for all of the transaction. And we visited

---

WHEREAS, pursuant to Section 11.1 of the Corporation Stock Plan, *immediately prior to the consummation of the Merger*, the Board will accelerate the vesting of each Option such that each Option is fully vested;

WHEREAS, upon the consummation of the Merger, all of the Options will be cancelled and converted into the right to receive the consideration set forth in . . . the Merger Agreement[.]

A1194.

[46] A1195. The Board also resolved "that, immediately prior to the consummation of the Merger, each Option shall have its vesting accelerated and shall be deemed fully vested[.]" *Id.*

25

with them about trying to understand how we discharged our duty of good faith in determining fair market value.

And their recommendation, which we agreed with, was that we should hire an independent evaluation, to find an expert who had experience in evaluating these very difficult-to-evaluate or early-stage venture-backed companies that had significant losses and mounting loses like we had with TargetNow, or Carisome, which was just an experimental idea that we hoped might someday have value.

So they recommended that we hire an independent advisor, and we agreed, of course, that made sense. And that's what we did[] to determine fair market value. We relied on the report of the experts.

There is no finding by the trial court as to why Johansen's testimony is not credible.[47] Based on the $725 million purchase price for the AP Business representing $4.46 per share and the $65 million valuation for SpinCo representing $0.61 per share, the FMV of each option was $5.07.[48] Thus, the Board confirmed the determination of FMV by written consent on November 22, 2011.

2.    *The Board Was Entitled to Rely on PwC's Valuation*

The trial court took issue with Caris' reliance on the PwC valuation, finding

---

[47] Laurie Johansen had business and law degrees from the University of Texas. After graduating from law school, she worked as a corporate associate at Akin Gump Strauss Hauer & Feld LLP. Thereafter, she was the general counsel and corporate secretary for a public company. In that capacity, she was responsible for the company's M & A and corporate finance projects.

[48] Grant Thornton clearly played a secondary and minimal advisory role, as reflected by the amount of work performed and the amount of compensation earned by them. *See* A802 (observing that the cost of Grant Thornton's engagement amounted to $22,000). Although there are legitimate criticisms of the advisors' analyses, the question for me is whether the Board reasonably relied on the advice of PwC. The unaddressed testimony recounted above, particularly Johansen's, convinces me that it did.

26

that it was a transfer tax valuation instead of a fair market valuation.[49] But at trial, Halbert, the Chairman and CEO of Caris, testified that PwC was engaged "to get to a fair market value, arm's -- what an arm's-length third-party would pay for the asset . . . ."[50] He stated that he "understood" from PwC's October 5, 2011 presentation that "they were doing a fair market value"[51] and that they were providing the Board with valuations of the TargetNow and Carisome businesses.[52] According to Halbert, the original report he received from PwC maintained a cover sheet that said "fair market value of the business enterprise."[53] The Caris Chairman and CEO also testified that, on October 5, the Board "believed it to be that [PwC was] attempting to provide a fair market value number valuation for the[ TargetNow and Carisome] businesses in an arm's-length way."[54] When asked whether his understanding ever changed, Halbert said, "No."[55]

Similarly, Johansen and Knowles both testified at trial that they understood PwC to be providing the Board with an FMV for TargetNow and Carisome.

---

[49] The trial court's finding that "[o]verwhelming evidence in the record makes clear that in rendering its decision, PwC did not determine the fair market value of TargetNow and Carisome" should not be read to mean that it found that *no* valuation determination had been made. *Fox*, 2015 WL 4571398, at *13. Rather, the Court of Chancery found that the valuation provided was a transfer pricing valuation of intellectual property. Again, while the Board did not act perfectly, it did act. And there is no finding that a majority of the directors acted in subjective bad faith.

[50] A504.

[51] A430.

[52] A554.

[53] A431.

[54] A554.

[55] A555.

According to Johansen, the Board asked PwC to provide it with "a fair market value analysis because we needed to have one done under the stock option plan. So they were -- that is what I understood them to be providing to the [B]oard."[56] When asked whether the Board "ever discuss[ed] the fair market value of Caris at the time the options were repurchased," Knowles testified that the Board "did discuss the [PwC] -- I think it was [PwC] who did a valuation."[57]

As to the Board's good faith reliance on the PwC valuation and what they were told, the Court of Chancery commented as follows at the conclusion of trial:

> . . . I do think PwC did a tax-style intellectual property valuation. The standard of fair market value may be the same, but when valuation professionals approach these things, they do things with different mindsets.
>
> \*      \*      \*
>
> There's very striking changes between what the [B]oard was told that PwC was doing, *i.e.*, valuing the [C]ompany, and what PwC then actually said it did in its final, which was valuing the assets, and what PwC's methodologies of analysis demonstrated it did, which was value the assets in the same way that they had previously done transfer tax valuations.
>
> *That's very good for the [B]oard in terms of the [B]oard's good faith. It's very hard when the [B]oard is told something to think that the members of the [B]oard or, here, the [P]lan administrators, acted in bad faith when they were told by PwC that we're doing something that they really didn't do.*[58]

---

[56] A768.
[57] B753-54.
[58] A795-96 (emphasis added).

28

Boards are permitted to consult with financial advisors when determining a company's value. Here, the directors also unquestionably relied upon their own views of the Company's value. There are no findings by the trial court that a majority of the Board knew of any flaws in PwC's or Grant Thornton's analyses.[59] Nor are there any findings that the directors acted in bad faith in relying, to the extent that they did, on PwC.

### 3. The Board's Views on the Value of SpinCo

Each of the directors who were asked about PwC's valuation at trial testified that it was optimistic. Carisome and TargetNow encountered significant difficulties in developing effective products. With respect to TargetNow in particular, Halbert testified that it was losing between 2 and $4 million a month.[60] While the Company was nonetheless "hopeful" that it might be able to obtain "a big number" in a sale of the TargetNow business,[61] Halbert testified that "we would have sold at basically any price" and that the Company was not "price sensitive."[62] With respect to Carisome, Halbert testified that the Company would have sold the business unit "at a certain price, for sure. It was just you don't have anything marketable. So why would somebody buy it? So they would buy it for

---

[59] In fact, the trial court concluded that the Board never saw the Grant Thornton report. *See Fox*, 2015 WL 4571398, at *4 (finding that Martino and Halbert "knew that the Board never saw the Grant Thornton report").
[60] A555.
[61] A462.
[62] *Id.*

some unknown reason and it would have to be a very low price. So there's no reason to sell it because it would be very, very cheap."[63] Halbert testified that, in 2011, he preferred to "roll the dice and keep going and see if we can make something out of [Carisome]. That's why I wouldn't sell at that time."[64] Further, he stated that, in 2011, the Company was "[h]opeful" that Carisome would develop a marketable product, but that it "couldn't get anything to work. So if nothing was working, it was a difficult time from that standpoint."[65] The absence of a Carisome product, Halbert testified, "was the challenge for the valuation."[66]

Directors Knowles, Johansen, and Castleman, each testified at trial that PwC's fair market valuation was in line with or higher than their subjective beliefs as to the value of SpinCo. Knowles testified that the valuations for the TargetNow and Carisome businesses presented by PwC to the Board on October 5, 2011 were both high.[67] As to TargetNow, Knowles stated that PwC's $47.23 million valuation was "high" because of "the very substantial investment that would be

---

[63] A434.

[64] A437.

[65] A533.

[66] A546.

[67] During his deposition, Knowles was asked whether it was his "understanding that [PwC] provided a fair market value of the assets of Caris[.]" B754. He responded as follows: "The definition of fair market -- market value is what you could sell it for, in my view. So if you ask me do I think that what was left of Caris after the disposal of the AP business was salable, then I have a memory -- I can't remember what the numbers were, but I remember thinking that it would be very difficult to sell it for that kind of price." B755. Further, when asked whether he had "any opinion at the time of the option repurchase in November of 2011 what the value of -- the fair market value of [sic] TargetNow business and Carisome business was[,]" he stated that he "remember[ed] thinking that [PwC's] was a relatively generous valuation in the context of market value . . . ." Id.

30

required to make it a seriously profitable product."[68] Further, when asked whether he viewed PwC's $17.79 million valuation of the Carisome business to be reasonable, Knowles testified that, in "light of the data, both at that time clinical and preclinical, I think this is too high."[69] Knowles stated that, in making a valuation determination, it was necessary to "bear in mind" that there was "a substantial proportion of even research people who didn't believe that this approach would give viable diagnostics. . . . This is absolutely cutting-edge science. You know, that's not usually worth a lot until you have clinical data."[70]

At trial, Johansen testified that oncologists were "resistant" to the TargetNow product and that insurance companies "didn't want to pay for it."[71] Accordingly, Johansen stated that, in 2011, "TargetNow was still losing money, and losses seemed to be accelerating as opposed to narrowing."[72] She observed that "there was no minimum price [for TargetNow]. I think for a lot of us on the [B]oard, we felt that just getting it off of our books, because it was losing money, just -- we would be willing just to almost give it away because -- or even shut it down, because it was not -- it was a highly complex and distracting business that was losing money and mounting losses."[73] As to Carisome, Johansen testified at

---

[68] A675.
[69] A676.
[70] *Id.*
[71] A745.
[72] A748.
[73] A756.

31

trial that the company "was just an experimental idea that we hoped might someday have value."[74] According to Johansen, in 2011, Carisome "was just basically an experiment . . . or series of mini-experiments, but there was no product offering. There was nothing really there more than a hope that, someday, we might have a successful offering, but there was nothing really to sell."[75] Ultimately, Johansen testified that PwC's valuation conclusions for TargetNow and Carisome "were very fair, that they were fair on the side of being generous because of the losses that we had in TargetNow and the state of the Carisome research."[76]

Castleman's views of TargetNow and Carisome were less optimistic than those of Halbert, Knowles, and Johansen.[77] At trial, Castleman testified that his view, in 2011, "was you shut Target[Now] down and you fire everyone in Carisome except for ten R&D people, and you run this as an R&D company. . . . But make it what it is, which is an R&D company, instead of combining those two

---

[74] A767.

[75] A760.

[76] A769.

[77] In my view, the record evidence before this Court does not support the conclusion that any of the directors were entirely unaware of his or her obligations under the Plan. Of the Company's six directors, the trial court found only that Knowles "did not know that the Plan existed." *Fox*, 2015 WL 4571398, at *23. But during his deposition, Knowles was asked whether "anybody from the Caris [B]oard" discussed with him the "cancellation or repurchase of options under th[e] Plan." B753. Knowles answered: "There was a proposal presented to the [B]oard." B753. Further, when asked whether he had "any idea what was paid" for the options, Knowles responded as follows: "I wouldn't remember. I would believe that I had been part of that -- I had heard a presentation and been part of that discussion. But I don't remember." *Id.* Knowles nonetheless expressed independent views as to FMV. Also, Knowles arrived from Finland the evening before trial and was deposed from 7:30 p.m. until 10:30 p.m. that same night, three years after the Board acted pursuant to the Plan.

companies, which were, again, bleeding 60, $70 million a year of cash."[78]  As to TargetNow specifically, Castleman reiterated that he believed it "should be shut down."[79]  He testified as follows:  "I thought it was a losing company.  I still believe that.  It's still in the same position it was four years ago, and it would be a dreadful IPO."[80]  Castleman also testified that he did not view Carisome to be "highly valuable" in 2011, observing that the company "did not have a product."[81]  He stated that he believed that Carisome was "potentially highly valuable," but that he did not "agree that it was a highly valuable business" in 2011.[82]

Where a board is subject to a contractual obligation to make a determination in "good faith" and the contract does not define good faith, the "determination will be considered to be in good faith unless" it "went 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'"[83]  This is a purely subjective standard.  In its Opinion, the trial court dismissed the independent directors' testimony and beliefs as to valuation based not on any express negative credibility determinations, but on its *hindsight bias* theory.  This implicit rejection stands in stark contrast to its own post-trial reflections, where it stated:

---

[78] A705.

[79] A723.

[80] *Id.*

[81] A711.

[82] *Id.*

[83] *DV Realty Advisors*, 75 A.3d at 110 (quoting *Brinckerhoff v. Enbridge Energy Co., Inc.*, 67 A.3d 369, 373 (Del. 2013)).

33

I almost, ironically, think the [B]oard would be infinitely better off had they never hired Grant Thornton or PwC and just made the type of judgmental assessment like they testified to on the stand. Because, obviously, this was a tough company to value. There is no question about that, and I'm very sympathetic to that.[84]

For me, the trial court's blanket rejection of thoughtful and consistent testimony by directors who were sequestered during trial does not logically follow from the evidence or from the court's own favorable post-trial impressions of the directors' testimony.

Further, instead of focusing on the subjective beliefs of the directors accused of wrongful conduct, the Court of Chancery's credibility findings centered on Martino, Halbert, PwC, and Grant Thornton. I believe this is also problematic, since there is no basis to attribute their conduct to the whole of the Board. Indeed, the court found that neither Martino nor Halbert were acting as the Board's

---

[84] A801. In various contexts, other courts have recognized the inherent difficulty in valuing medical science companies and calculating market value and potential profitability when such companies do not yet have marketable products. *See, e.g., AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1345 (S.D. Fla. 2006) ("[O]nly a minuscule percentage of drugs in development ever reaches the commercial market—and of those, only a subset ever prove profitable for their manufacturer. Accordingly, reliance on a multitude of assumptions is endemic to any valuation of the prospective profitability of new pharmaceutical products." (internal citation omitted)), *aff'd*, 294 F. App'x 501 (11th Cir. 2008). In the pharmaceutical context, Delaware courts have recently wrestled with expectation damages awards for breach of a contractual obligation to negotiate in good faith. *See PharmAthene, Inc. v. SIGA Techs., Inc.*, 2011 WL 4390726 (Del. Ch. Sept. 22, 2011), *aff'd in part and rev'd in part*, 67 A.3d 330 (Del. 2013), *remanded to* 2014 WL 3974167 (Del. Ch. Aug. 8, 2014), *aff'd*, 132 A.3d 1108 (Del. 2015); *see also id.* at 1139-54 (Valihura, J., dissenting) (concluding in the dissent that expectation damages for breach of preliminary agreement to negotiate in good faith were speculative and too uncertain, contingent, and conjectural). Here, the molecular diagnostics technology market was emerging and both TargetNow and Carisome's products endured significant "setbacks," rendering the valuation exercise difficult and highly speculative. *See Fox*, 2015 WL 4571398, at *6-7.

agents.[85] Ultimately, the Board's determination of FMV was not so far beyond the bounds of reason as to be inexplicable on any ground other than bad faith.

## C. *The Board Determined the Adjustment*

Nor do I believe that the record supports the conclusion that the Board breached the Plan as to the required adjustment. The Plan required the Administrator to proportionately adjust the exercise price of the options to reflect the change in the FMV of the Company's common stock as a result of the spin-off of TargetNow and Carisome.[86] Because the Plan granted participants options to purchase Caris stock, both the number of shares underlying a participant's award and the exercise price were adjusted. As explained by the Company, by dividing the implied residual equity value of pre-spin-off Caris by the implied equity value of the merger consideration, the adjustment factor was calculated to be 1.137.[87] The strike price for the options was then divided by 1.137, and the number of issued and outstanding options was multiplied by 1.137.[88] Accordingly, the strike price for the options was reduced and the number of options issued and outstanding prior to the Effective Time was deemed to be increased, although the additional

---

[85] *See, e.g., id.* at *23 ("The Board could have empowered Halbert as a one-person committee. It didn't.").

[86] *See* May 5, 2015 Letter at 5-6, *Fox v. CDx Holdings, Inc.,* C.A. No. 8031-VCL (Del. Ch. July 28, 2015) ("Rather, such adjustments were made to ensure that the amount paid to option holders by virtue of the Option Payment (which was based on the number of options that were actually issued and outstanding immediately prior to the Effective Time) included the value of the TargetNow and Carisome assets distributed to stockholders as part of the spin-off.").

[87] *Id.* at 4-5.

[88] *Id.* at 5.

options "were not actually issued since all options were cancelled and the Plan [was] terminated at the Effective Time."[89] The adjustment ensured that the option holders received a payout that included the value of SpinCo.

In accordance with Section 2.09 of the Merger Agreement, on November 18, 2011, the Company delivered to Miraca a good faith estimate of the purchase price in connection with the merger (the "Estimated Purchase Price"). The Merger Agreement also required that the Company, no later than three business days prior to the closing, "prepare and deliver to [Miraca] a schedule setting forth the respective amounts of the consideration payable at the Closing to each holder of Company Equity Securities" on a holder-by-holder basis (the "Closing Consideration Schedule").[90] The Company also delivered an Officer's Certificate, dated November 16, 2011, executed on behalf of Caris by Martino, certifying that the Estimated Purchase Price and the Closing Consideration Schedule were calculated in good faith.[91] Specifically, the Officer's Certificate states that, "[t]he undersigned hereby certifies that, as of the date hereof, the information set forth in the Estimated Purchase Price and the Closing Consideration Schedule was calculated in good faith in accordance with the Merger Agreement and the

---

[89] *Id.*
[90] A1220.
[91] AR411.

Governing Documents of the Company."[92]  It states further that Martino executed it "on behalf of the Company and not in his personal capacity."

On November 22, 2011, the Board entered into a Unanimous Written Consent pursuant to 8 *Del. C.* § 141(f) (the "Consent").[93]  The Consent reflects that Caris entered into the Merger Agreement, dated as of October 6, 2011, with Miraca and that, as a condition of the merger, Caris entered into a Separation Agreement, dated as of November 16, 2011, with wholly owned subsidiaries of the Company.[94] The recitals state that the Board desired to declare the payment of the distribution as contemplated by the Separation Agreement, and as resolved by the Board on October 5, 2011.  Pursuant to Section 2.11(b) of the Merger Agreement, the Consent also recites that the Plan would terminate as of the Effective Time of the merger, which was ultimately November 22, 2011.  It further recites that pursuant to Section 12.1 of the Plan, Caris shall take all necessary actions "to proportionately adjust all outstanding Company Options to take into account the Distribution . . . ."[95]

Consistent with these recitals, the Board unanimously consented to the following resolutions:

---

[92] *Id.*
[93] A1399.
[94] The Board approved the Separation Agreement on October 5, 2011. *Id.*
[95] A1400.

**RESOLVED**, that the Board hereby declares the payment of the Distribution as contemplated by the Separation Agreement and as resolved by the Board on October 5, 2011;

**RESOLVED**, that as of the Effective Time, the [] Plan shall terminate in accordance with its terms and no person shall have any rights under the [] Plan thereafter, other than as set forth in the Merger Agreement or by applicable Law;

**RESOLVED**, that, effective upon, and subject to, the consummation of the Distribution, each Company Option shall be proportionately adjusted in accordance with Section 12.1 of the [] Plan and the underlying option grant agreements to take into account the Distribution; provided that any fractional shares resulting from such adjustment shall be eliminated; and

**RESOLVED**, that all actions taken by the Board or any officer(s) of the Corporation prior to the date hereof, in connection with the transactions contemplated hereby, and in order to effectuate the purpose and intent of the forgoing [*sic*] resolutions be, and hereby are, ratified and approved.[96]

I agree with the Court of Chancery's conclusion that simply because a resolution says something will be done does not make it so. But the evidence in the record shows that, in accordance the mandate of the Board's resolutions, Caris' officers and advisors prepared a spreadsheet setting forth the consideration that each option holder would receive after adjusting the options and factoring in the Company's complicated equity structure.[97] Johansen testified at trial that the

---

[96] *Id.*

[97] A789; AR410-35. The October 5 resolutions should not be faulted for failing to document the adjustment to the options, as the Merger Agreement and ancillary documents contemplated that any action with respect to the options would be taken immediately prior to the Effective Time, which was November 22, 2011.

38

Board approved an adjustment of the exercise price for the options to take into account the spin-off.[98]

Further, it appears to me that the Court of Chancery's Opinion is internally inconsistent with respect to its discussion of whether and how the adjustment was determined. The court states that, in combination with an October 6, 2011 discussion of the value of the common stock of the Company, an email exchange between Halbert and Martino resolving to utilize the PwC valuation for purposes of the transaction *"was the extent of the determination for both the Fair Market Value of a share of common stock and the adjustment of the stock options for purposes of the [spin-off]."*[99] Yet it also recounts that "[a]fter trial, Caris was permitted to supplement the record with two additional exhibits."[100] These submissions were made pursuant to an extended discussion between counsel and the Court of Chancery during post-trial arguments regarding the adjustment that was made. In simultaneous submissions, dated May 5, 2015, the parties further addressed the mechanics of the option adjustment. The trial court found that the Company's supplemental submission "confirmed that Caris" had adjusted the options "as described during post-trial oral argument."[101] While the parties may

_____

[98] A765 (Q. "And also did the [B]oard approve an adjustment of the exercise price for the options to take into account the distribution of New Caris stock?" A. "Yes.").

[99] *Fox*, 2015 WL 4571398, at *23 (emphasis in original and added).

[100] *Id.* at *3.

[101] *Id.* at *34. It is not evident from the record before this Court that Fox ever sought to understand the mechanics of the adjustments, the waterfall, or whether an adjustment to the

39

have contributed to the confusion by suggesting that the options had been treated differently in the pre-trial proceedings, an adjustment, as authorized by the November 22, 2011 Consent, was made by Martino and the Company's advisors.

In view of the foregoing, I believe the evidence demonstrates that the Board, as it was authorized to do pursuant to Section 3.3 of the Plan, delegated the complex computational task of determining the adjustment to the options to Martino and the Company's advisors.[102] The Board approved these actions in its November 22 unanimous consent. That approval is unquestionably Board action. Although the Court of Chancery concluded that the Board failed to make the adjustment, it nonetheless recognized that Caris "handled the options" by adjusting the exercise price.[103] Sections 3.3 and 3.4 of the Plan gave the Board broad authority in its administration of the contract, and the delegation of the adjustment was within the Board's discretion "to make any and all . . . determinations which it determines to be necessary or advisable for administration of the Plan" and not

---

options had in fact occurred. Nor is there evidence that Fox questioned Martino and Citi, who created the equity waterfall, about the closing mechanics.

[102] Johansen testified that the Board was not responsible for developing the waterfall mechanics to effect the adjustment. A789. Rather, this complicated exercise was delegated to Martino and "the finance staff working with the bankers and [the] accountants." *Id.* According to Johansen, Martino "spent many countless hours trying to sort through it all because of the complexity." *Id.* In my view, this is the type of task that a Board is justified in delegating to its CFO and advisors, and the Plan permits that delegation.

[103] *Fox*, 2015 WL 4571398, at *33-34.

40

"arbitrary and capricious."[104] The Board, therefore, determined the adjustment in a manner that satisfied its obligations under the Plan.

## III. CONCLUSION

I believe the Court of Chancery erred, as set forth above. I respectfully dissent.

---

[104] *See* A817-18. I do not address whether the trial court erred in employing the arbitrary and capricious standard developed in the context of decisions by administrative agencies. The question of whether the Board's decisions under the Plan were "arbitrary and capricious" was not identified in the parties' pre-trial order as one of the issues to be litigated at trial. I would have concluded that the argument was waived. Thus, I do not address the possibility that the Plan might have been breached under an arbitrary and capricious standard where, for example, the Board acted in subjective good faith but the valuation might have been manipulated.